Rhoda Leeper, Appellee, v. Arthur E. Gay, Administrator of the Estate of William Riley, Deceased, Appellant.

Gen. No. 8,278.

Opinion filed January 24, 1929.

M. FINLAY CARROTT, for appellant.

WILSON & SCHMEIDESKAMP, for appellee.

MR. JUSTICE SHURTLEFF delivered the opinion of the court.

This is an appeal by appellant, administrator of the estate of William Riley, deceased (called the estate in this opinion), from a judgment entered in the circuit court of Adams county in favor of appellee (denominated herein the claimant) for the sum of $1,060 as an allowance to claimant for care of the deceased in his lifetime. The proofs on the part of claimant tended to show that claimant nursed and cared for the deceased from August 14, 1923, to September 1, 1925, the date of his death. He was a batchelor and came to live with claimant early in 1922. While he was well along in years and had retired from business, he was in good health and remained in good health until August, 1923, and prior to that time did not require any nursing or personal care. Claimant agreed with him to give him board and lodging for $6 a week. In November, 1922, there appears to have been a conference at the Camp Point Bank between claimant and Mrs. Eunice Allen, the mother of claimant, since deceased, and William Riley, Mordecai Riley, his brother, and Arthur E. Gay, at which time the board and lodging of deceased was increased from $6 to $7 per week. The controversy commences with this meeting, the contention of the estate being that claimant at this time

entered into a contract, agreeing to furnish room, board, care and washing for the deceased, while it is insisted by claimant that nothing was said about care as deceased at that time was in perfectly good health and not in need of any care or nursing. It is further claimed by the estate that claimant later demanded and received $3 per week extra, at various times, on account of the sickness of deceased, which claimant denied and insisted that any extra sums which she received over $7 a week were for expenses that she incurred for purchases for deceased's benefit.

It is further contended by claimant that in August, 1923, deceased became seriously incapacitated and his condition steadily grew worse until the time of his death on September 1, 1925; that deceased was a serious and almost constant care and burden from the month of August, 1923, until the time of his death; that from August, 1923, on, his bodily functions were so impaired that he frequently soiled the bed clothing and his own clothes both by day and by night, and also the carpets and furniture; that he had to be fed at the table, and to receive more or less assistance in getting around the premises.

The testimony of claimant as to the value of the services was uncontradicted and there seems to be no question but that claimant was paid the sum of $6 per week and $7 per week after November, 1922, by check given her until the deceased died, except the sum of $15.71 on said account was paid to claimant after his death. The deceased's business affairs apparently were managed by the bank, of which the witness Gay in this suit, administrator and appellant, was president. Generally the checks appear to have been signed by the deceased making his mark, often in the presence of Gay, and some checks were signed by the president for the deceased. A number of the checks running through the period are marked "For Board" and one

check for $20 was found, marked "Mar. 13 to Mar. 28, (1925) $15, extra pay, $5.00." Another check for $7 was found, marked "Paid to April 18, 1925," and many checks were found with an additional amount added, as for example, one for $11.50 with the notation, "Telephone for Wm. Riley goods," and one for $2.80 marked "for shoes." The witness Gay, for appellant, testified: "She (claimant) bought his clothing and she would give it to William and say to me to send a check to her for so much clothing. Sometimes she would say, 'William was sick last week, at $3,' and the check for this week which would be for $10." The witness testified that the $10 per week was for such weeks as the deceased was sick and required additional care. It was contended by the estate that there was an implied understanding that in case of sickness the deceased was to pay an additional sum of $3 per week. This was denied by claimant. In this connection counsel for the estate inquired of the witness: "About how many times was she paid $3 extra for his care?" This question was objected to and the objection was sustained by the court, to which ruling the estate assigns error. All payments were made by check, of which the witness Gay made out a considerable number. The checks were all in evidence and constituted the best evidence. The account of the deceased at the bank, showing all deposits made and checks drawn, was offered in evidence, is in the record and we have examined same, and the record of all of the checks given claimant is before us. We find only one check for $3 given by the deceased on June 28, 1924, and one check for $10 given by deceased on March 10, 1924. So far as we can determine from the record before us, no check for $3 or for $10 was ever paid to the claimant from the funds of the deceased, and we find only one check, dated August 8, 1925, for $17 with the note, "extra for past week $3." The witness Gay probably knew more about the business of deceased in his life-

time than any other person, and was appointed administrator of his estate.

On September 25, 1925, after the death of Riley, a claim was made out by claimant for $15.71, sworn to before the administrator and was paid. This claim is conceded to be for board and is marked "To board." At the time it was made out it was distinguished from another claim then made. The witness Gay testified: "About the time I prepared the claim for $15.71 I prepared another claim for her for $150. I prepared the $150 claim afterwards. I drew the claim at the instance of Mordecai Riley and Mrs. Leeper. Mordecai is a brother of William and one of the beneficiaries of his estate. I did not prepare any $150 claim; it was a claim Mr. Riley wanted to give her."

Gay further testified: "I told her she would have to come up to the bank, that I would have to make it in the form of a claim. I talked to her in her house about it in the presence of Mordecai Riley. I told her I could not hand her $150, but would have to put it in the form of a claim. She came up to the bank. I did not draw a claim for $150. I am sure I didn't draw a claim for $150 and it was afterwards torn up. I had a further conversation with her at the bank. In that conversation she didn't exactly refuse the $150 but wanted me to see if I could get them to make it $200. I said I didn't draw a $150 claim, but drew one for $200. She signed the claim which was afterwards torn up. She said she would not take that; she did not say what she wanted but said she would not take the $200. She insisted on more than $200. After William's death Mordecai and I were out at her house when Mordecai said: 'Gay, it would be all right to give Rhoda $150 extra; just make her a present of it. She has been good to all those coming here and she has taken good care of William and I would like to give her that much. Rhoda has not been paid very strong; we will give her $150.' "

There was testimony in the record sufficiently ample, if it was credited by the jury, to conclude that the condition of deceased during the period was such that the care and nursing required and performed warranted the verdict.

Witnesses were offered by claimant, who testified that in conversations with Riley they had heard him say: "Mrs. Leeper was just as good as a mother; that his brother would not keep him; that he didn't have very much but that she was going to be well paid when he was gone." To others he was quoted as saying that "he was paying her (claimant) for his board, but he was not paying her what she really ought to have for caring for him, but when he was through with it he wanted her to be well paid for it." Other similar statements were made.

There was some talk of a will and the witness Dan Perrigo testified that claimant told him she had a will drawn for the deceased, but he would not sign. The same witness testified that claimant told him she received $3 at different times as extra pay for nursing and care. The claimant denied these statements, and as to the extra payments she is corroborated by the bank's record of the account of the deceased. The cause was submitted to a jury upon all of these proofs and the jury has found in favor of the claimant. The record is brought to this court by the estate for review.

The main contention of fact seems to be over the contract made in the bank at Camp Point in November, 1922, between the claimant, in the presence of her mother, and the deceased, in the presence of his brother and Gay. It is the contention of the claimant that the payment of $7 per week was to cover only the board and room. On the other hand, it is the contention of the estate that the language used covered board, room, nursing and care. The latter contention is much weakened by the proofs that shortly thereafter, accord-

ing to appellant's contention, there was a new arrangement made to pay $3 a week extra whenever the deceased was sick or needed further care. Both claims are weakened in the proofs by the attempt of Mordecai Riley, a brother, to make a present of $150 or $200 to the claimant after his brother's decease. The jury heard the testimony, had the witnesses before them, and while the proofs are conflicting we cannot say that the verdict is against the manifest weight of the testimony and appellee is entitled to all the favorable inferences to be drawn therefrom. (*Dick v. Zimmerman,* 105 Ill. App. 615, 616; *O'Brien v. Palmer,* 49 Ill. 72, and *Hess v. Rosenthal,* 55 Ill. App. 324.)

Inasmuch as the evidence of either side to the controversy, standing alone in the record, would support a verdict, the verdict may be accepted as decisive of the controversy. (*Abrams v. Rideout,* 101 Ill. App. 131; *Watson v. Fagner,* 105 Ill. App. 52, affirmed 208 Ill. 136; *Whitsell v. Rising,* 109 Ill. App. 91.)

The fact that payment was made for board raised no presumption that it was intended as full satisfaction for all services rendered. *Fry v. Fry,* 119 Mo. App. 476, 94 S. W. 990.

Appellants assign error upon the sustaining of objections by the court to the offer of testimony on the part of appellant. The witness Omer was not permitted to state what payments were made by deceased to claimant after November, 1922, unless the payments were made by the witness; and the further question if more payments were made thereafter than had been paid before. The estate was not prejudiced by these rulings, as the evidence of all payments, with their respective dates, was before the jury and the questions were not competent. The witness Mordecai Riley was not permitted to state whether the claimant in his presence had ever asked for any money for boarding and taking care of his brother other than the $7 and

$10 per week. There was no proof in the record that an answer to the question could have contradicted and the question called for a conclusion. Other similar questions were asked and objections sustained, to which we need not give further space.

Appellant assigns error upon the giving of certain instructions for appellee. The second instruction informed the jury if they believed from a preponderance of the evidence that claimant, with the consent of the deceased, rendered services to the deceased, which were accepted by him, and that the claimant had not been paid for such services, if any, then that the claimant would be entitled to recover, etc. To this and other instructions it is objected that the language of the instruction might be construed to cover services other than care and nursing specifically mentioned in the claim presented. The jury could not have been misled by this instruction, as it was conceded upon the trial that all claims for board and lodging had been paid, and the entire controversy was over the claim for "care and nursing."

The next instruction objected to limits the services to such as might have been rendered in addition to board and lodging. All of the instructions are to be read as a series. *McFarlane v. Chicago City Ry. Co.*, 288 Ill. 476. The presumption would be that the services mentioned in the instruction were those included in the claim. The instruction was correct and stated a recognized principle of law. *Rogers v. Daniels*, 116 Ill. App. 515. The rule laid down in *Miller v. Miller*, 16 Ill. 296, does not apply inasmuch as the family relation was involved in *Miller v. Miller, supra*, and is not involved in the case at bar; it was not involved in *Rogers v. Daniels, supra*.

We cannot agree with appellant in his objections to appellee's instructions numbered two, three, four and five. Appellant assigns error upon the refusal of the

court to give appellant's offered instructions seventeen and twenty-two. Appellant's instruction number seventeen is sufficiently covered by appellant's instruction number nine and the substance of appellant's instruction number twenty-two is sufficiently covered by appellant's instruction number thirteen.

Finding no errors in the record sufficient to warrant a reversal, the judgment of the circuit court of Adams county is affirmed.

*Affirmed.*